MITFORD C. MASSIE, individually and as trustee, &c., et al., complainants,

*v.*

THE ASBESTOS BRAKE COMPANY et al., defendants.

[Decided September 28th, 1923.]

On appeal of Mitford C. Massie et al.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Buchanan, who filed the following opinion:

"By separate respective written agreements, each dated May 2d, 1911, the Asbestos Brake Company, assignee and owner of certain patents and patent applications, granted

licenses to the defendants H. W. Johns-Manville Company and Thermoid Rubber Company to manufacture and sell and use articles (asbestos brake linings) covered by the patents and patent applications, and the said defendants as such licensees, contracted, *inter alia,* to pay to the Asbestos Brake Company, monthly, certain royalties on all such articles so sold by it, and to send certain daily and monthly reports of all such sales.

"Complainant Massie, as a stockholder of Asbestos Brake Company, being unable to procure the latter company to bring this suit, filed this bill on behalf of himself and all other stockholders against the licensees (joining Asbestos Brake Company as a defendant), alleging the manufacture and sale of large quantities of the licensed articles by the licensee-defendants, and that no reports or accounts have been rendered, nor any payment of royalties made, and ask such accounting and payment and for a decree of specific performance of the license contracts for the future.

"Conrad Hubert, the only other person in addition to complainant and the two licensee-defendants holding stock in Asbestos Brake Company, subsequently applied and was admitted as a party co-complainant, and a decree *pro confesso* was duly taken against Asbestos Brake Company.

"The defendants H. W. Johns-Manville Company (hereinafter referred to as the 'Manville Co.'), and Thermoid Rubber Company (hereinafter referred to as the 'Thermoid Co.') filed separate, but practically identical, answers.

"The defenses thereby interposed are—

"1. That the license agreements in question were executed and delivered only upon, and subject to, and as a part of, an express agreement by all parties that they were to become and be binding and effective only upon certain contingencies, and that those contingencies never eventuated.

"2. That subsequent to the making of said license agreements, an agreement was made by all parties rescinding the said license agreements and suspending the force and operation of the requirement of the payment of royalties.

"3. That complainants have acquiesced for eight years in the non-performance or breach by the defendants, and are equitably estopped from suing thereon at the present time.

"4. Laches.

"5. That the license agreements in question are a part of a combination in restraint of trade in contravention of the federal statute commonly known as the Sherman Anti-Trust act, and are therefore illegal and void, and no suit can be maintained upon them.

"In dealing with the issues thus raised, and particularly in relation to the last-mentioned defence, it is necessary to consider the acts and dealings of the parties from the commencement of their relationships with each other, as well as the circumstances and conditions with respect to the manufacture, use and sale of brake linings. As to most of the following facts there is no real controversy.

"With the advent of motor vehicles and the development of the gasoline engine at the commencement of the present century, a new field was opened in the use of brake linings, and one in which the conditions and requisite factors differed from those theretofore controlling. A number of inventors began experimenting with asbestos and applied for patents on the results of their endeavors. One of these was Clyde J. Coleman, who assigned to Hubert (one of the present complainants) his application for patent; another was William T. Bonner, who assigned his application to the Thermoid Co., and there were also Louis D. Hoff and Cutting & Jewett, whose applications were assigned to the Manville Co. Interferences were declared in the patent office among these several applications.

"Thereafter negotiations were begun among the three owners of the several applications looking toward an arrangement whereby each and all should be able to manufacture and sell brake linings embodying all of the several and various inventions and improvements comprised in each of the several applications for patent, and these negotiations resulted about September 22d, 1910, in a tri-partite agreement among them bearing that date.

"This agreement recited the several applications for patent and their several ownerships among the three parties; the fact of the interferences; the desire of the parties to settle the interferences to their 'mutual' advantage, and provided and agreed that the three (Hubert, Manville Co. and Thermoid Co.) should join in the incorporation of a company to be named Asbestos Brake Company, with specified charter and by-laws; that the pending interferences should be prosecuted to decision; that all of the inventions in the said applications for patent, and the patents to be issued thereon, should be assigned to the Asbestos Brake Company, subject to the condition, however, that the Asbestos Brake Company should give to Auto Improvement Company (a corporation controlled by Hubert), the Manville Co. and the Thermoid Co., licenses to manufacture and sell under said inventions and patents and under all other inventions and patents which might thereafter be owned or controlled by Asbestos Brake Company (which licenses were to be under a specified form of license agreement) ; that the three proposed licensees would accept and execute such license agreements; that the licensees should sell the manufactured articles at scheduled prices and make monthly report to the Asbestos Brake Company and pay a royalty of 10 per cent.

"By the time this agreement was made Bonner and Hoff had each filed application for patent for improvements in asbestos brake linings, which conflicted and were placed in interference by the patent office. This application of Hoff had been assigned by him to the Manville Co. while Bonner's had been assigned to Brake Liners Company, a company in which he (Bonner) was a large stockholder.

"As the result of further negotiations another agreement—a quadri-partite agreement—was made, dated March 6th, 1911, among the three parties to the agreement of September 22d, 1910, and the Brake Liners Company, whereby the latter company became a party to the agreement of September 22d, 1910, and certain modifications were made therein to conform to the circumstance of there being four parties, instead of three, thereto. The Brake Liners Company was to

assign its inventions and patents to Asbestos Brake Company, and to receive for itself or its nominee a license similar to the licenses to be issued to the other three.

"The provisions of these agreements were for the most part duly carried out. The Asbestos Brake Company was incorporated in March, 1911, with the four parties as stockholders, and organized formally May 2d, 1911; all of the applications for patent were assigned to the new company; the new company issued license agreements to the Manville Co. and the Thermoid Co., but none to Hubert or his Auto Improvement Company, nor to Brake Liners Company or any nominee thereof. The interferences were proceeded with, and patents were issued and of course became the property of the new company. Subsequently, other patents on asbestos brake linings were issued to the new company on later applications of Hoff, Bonner and Headson (another employe of the Manville Co.).

"During all this time—that is, prior to the negotiations leading up to the agreement of September 22d, 1910, and continuing uninterruptedly, the Manville Co. and the Thermoid Co. had been manufacturing and selling asbestos brake linings in open competition with each other and a number of other manufacturers. It was, of course, the hope and desire of each of these two companies, prior to the interferences, that upon the patent applications owned by it, a patent would issue to it, which would give to it the patent monopoly in these articles—the sole right to manufacture and sell asbestos brake bands, thus eliminating the competition of the other manufacturers thereof, who would either have to quit the field or pay royalties to the owner of the patent. Competition, doubtless is the life trade from a broad, general standpoint, but it is the *beté noire* of the individual manufacturer or merchant. If he can eliminate competition, his prices and therefore his profits will increase, the consuming public suffers accordingly; hence, the statutory provisions against combinations for that purpose. Monopolies based on the ownership of secret processes or inventions and

upon the ownership of patents are, however, legal, and, of course, highly desirable to the manufacturer or merchant.

I think it is also unquestionable that at the time of the negotiations for the agreement—whatever may have been the fact later on—the Thermoid and Manville companies, and, of course, the other parties to the agreement, were still actuated by this desire, in a modified form. The claims of the several patents were different—a patent might issue to one on asbestos brake linings in general, and a patent to another on an improved asbestos brake lining, and to still another on a further improvement—in which case the latter two could make no asbestos brake linings at all without the consent of the former, and the former could not make the improved lining (which might be the only practical, salable form of the articles) without the consent of the latter two. But if all the patents were combined in one ownership (which could legally, at least under certain circumstances, be done), all would reap and share in the benefits and profits of the marketable improved articles covered by the several patents, and exclude the competition of all other manufacturers.

"It must also be borne in mind, however, that patents in this country are not conclusively valid against all the world. It is an unfortunate but well-known fact that when a man has received his patent 'his troubles have just begun,' and the more valuable his patent is, if valid, the more trouble and expense he will have. Comparatively seldom does the original inventor of an article covered by a valuable patent reap his just reward. Competitors already in the field do not give up without a struggle, and other competitors arise. Some may be bold infringers, pure and simple, taking a chance on making as much as possible before they are stopped; some claiming, honestly or dishonestly, that the patent is invalid, that the invention is not patentable, or that the patentee's invention was anticipated by others.

"Of course, the parties to this agreement did not believe that upon the issuing of the patents the competing manufacturers would forthwith and without difficulty acknowledge the validity of the patents and the right of the Asbestos Brake

Company to monopoly in the asbestos brake lining field, and enter into license agreements whereby they would pay royalties to the Asbestos Brake Company. And it is, of course, evident that if competitors should be allowed to infringe these patents unchecked, a licensee under the patents would be worse off than before, since he would be handicapped in his competition with the outsiders by the additional costs arising from his payment of royalties.

"Hence, the provisions in the license agreements that the licensor should prosecute infringers, provisions frequent and usual, though not invariable, in such license agreements, and the desire and the efforts to get other manufacturers to take licenses without the compulsion of infringement suits.

"The Thermoid Co. and the Manville Co. did, in fact, pursuant to the pre-corporate agreements, execute license agreements with the Asbestos Brake Company, receiving the right to manufacture and sell the patented articles, and binding themselves to pay royalties to the Asbestos Brake Company on all the patented articles made and sold by them. These two companies, therefore, occupied a dual position toward the Asbestos Brake Company, for they were also stockholders therein—each holding one-quarter of the preferred stock (of which Hubert and the Brake Liners Company also held each one-quarter), and together holding seventy per cent. of the common stock (of which Hubert and the Brake Liners Company held each fifteen per cent.). By the certificate of incorporation and the by-laws, the election of directors and the power to change the certificate of incorporation or the by-laws was vested in the preferred stockholders, and there were four directors and four officers (the same persons as the directors), divided among the four respective interests, so that each interest was represented by its own director (and officer), and no two interests could exercise control. The Thermoid Co. and the Manville Co. were manufacturers; Hubert and the Brake Liners Company were not.

"After the formal organization of the company and issuing of the licenses in question, in May, 1911, the next directors' meeting was held in July, 1911. All four directors (one

representing each of the four stockholding interests) were present and a beginning was made upon the matter of endeavoring to get the outside competitors to acknowledge the Asbestos Brake Company's patents and resultant control of the field and to get them to enter into license-royalty agreements with the Asbestos Brake Company. These endeavors were carried on by correspondence and by some personal interviews for some months, with practically no success. One or two directors' meetings were had during this time, and all four directors knew of the situation. One thing that became apparent was that the schedule of prices which the Asbestos Brake Company proposed to have adopted by its licensees was very generally considered too high, and a resolution was adopted August 29th that a lower schedule should be adopted after further interviews with prospective or possible licensees.

"No other licensees were obtained either then or at any subsequent time. The last meeting of the company was a directors' meeting, January 17th, 1912. Since then, although the corporate existence has been kept alive, it has not functioned in any way. No stockholders' or directors' meetings have been held or called, nor has there been any effort by anyone to call such meetings. No additional licensees have been procured, no prosecution of infringers has been had or begun. No moneys have been paid, and no reports rendered by the Thermoid Co. or the Manville Co., although those two companies have at all times continued to manufacture and sell brake lining just as before, and such manufacture and sale is admittedly, except for the license, in infringement of the patents of the Asbestos Brake Company. No effort has been made by the Asbestos Brake Company to compel the Thermoid Co and the Manville Co. to make the reports and the payments as provided by their license agreements until the commencement of this suit in 1919, nor has any such effort, at least of any formal kind, been made by or on behalf of either of the other two stockholding interests in the Asbestos Brake Company.

"The first defense interposed by the defendant in the present suit is that there was an agreement that the license agreement should be operative and valid only under certain conditions—'an agreement contemporaneous with the organization of the company and the execution and delivery of the license agreements from the Asbestos Brake Company to the Johns-Manville Company that the license agreement was to become effective only when and if the Asbestos Brake Company should be successful in establishing its monopoly under the patents by forcing competing manufacturers to take out licenses under its patents.'

"I do not believe there ever was any such agreement, and I so find. There is no proof of any written agreement, nor indeed of any agreement by the Asbestos Brake Company as such. And even if we go behind the corporate entity to the actual parties in interest, the proof offered of any agreement between them is of a rather indefinite and decidedly unconvincing character. This proof consists of testimony of Mr. J. O. Stokes and Mr. W. J. B. Stokes (both officers of the Thermoid Co.), and of Mr. T. F. Manville (of the Manville Co.), to the effect that it was repeatedly discussed and agreed amongst all that the license agreements which were to be and were executed between the Asbestos Brake Company on the one hand, and the Manville Co. and Thermoid Co. on the other hand, were not to be effective unless other manufacturers were forced to come in and take license agreements and pay royalties to the Asbestos Brake Company. Messrs. Hubert, Bonner and Massie (the other individuals in interests), testify that no such conversations were ever had with them and that they never heard of any such agreement or proposed agreement. Mr. Williams, the attorney of Hubert, and Mr. Lowthorp, then the attorney for the Thermoid Co., likewise so testify. Mr. Parker-Smith, the attorney for the Manville Co., fails to testify as to such conversation or agreement.

"Looking to the circumstances and the inherent probabilities of the situation, the argument is not without weight, that the Thermoid Co. and Manville Co. would have been unlikely to handicap themselves as manufacturers by these agreements

to pay royalty, unless their competitors should be likewise burdened. The answer may be made, however, that it is evident that they expected and intended that their competitors should be compelled to pay royalties, or else should be restrained from manufacturing or selling, and that these very agreements so provided. When it is remembered that all these four interests, although combining as against the outside field, were separate and individual as among themselves, and particularly so in the negotiations and detailed steps of putting the project through, that each was represented by skilled counsel, whose care and attention are evident all through the proceeding, it is impossible to believe that if there had been any such agreement it would not have been known by them, or indeed that it would not have been reduced to writing and formal execution. There is another circumstance, adding further weight to the conclusion that there was never any such agreement. On October 5th, 1911, Mr. Massie wrote to Joseph O. Stokes and sent a copy of the letter to Mr. Manville. In this latter he called attention to the fact that the Thermoid Co. and Manville Co. were not paying royalties or making returns to the Asbestos Brake Company as provided by the license agreements. These two men—Stokes and Manville—are two of the three persons who testify in this suit that the alleged contemporaneous agreement was made, and these two testified as to conversations had by themselves with Massie, recognizing and constituting such contemporaneous agreement, conversations said to have been had only six months before they received this letter. Can it be imagined that, under those circumstances, they or either of them could have received this letter from Mr. Massie without immediately replying to him and calling his attention to such agreement. But there is no such proof, and the reason there is no such proof is obviously because there never had been any such agreement. What Stokes and Manville did do was to father the so-called 'rescission resolution' of the Asbestos Brake Company, on November 14th, 1911 (later to be mentioned), colorably indicating a rescission by that company of the requirement that the Manville Co. and

Thermoid Co. should pay royalties. Nothing is mentioned in that 'resolution' about any such alleged contemporaneous agreement, and such omission is not without weight, for while it is not inconceivable that such a resolution might have been so framed, even if there had been the alleged contemporaneous agreement, it would be far more probable that mention of it would have been made in the resolution or in a preamble, as explaining and giving the reason for such action by the company; an action which needed such explanation, if it existed, for otherwise it was without consideration.

"Finally, there is what seems to me the very significant language of two of the defendants' own witnesses in testifying as to how and why the 'rescinding resolution' was passed. Greenwood, Manville's secretary, on his direct examination, and also in his cross-examination, testified that Manville, in proposing the resolution, gave as the reason for so doing that the Asbestos Brake Company had not been successful in getting any other manufacturers to take licenses, and that the Manville Co. could not afford to pay the royalties under the license agreement, and therefore he moved that they be 'waived' or rescinded. He says nothing about any statement by anybody that there had been any prior agreement or understanding to that effect. W. J. B. Stokes, also, in his direct testimony, says that Manville, in proposing the resolution, said that the Asbestos Brake Company had made unsuccessful efforts to get other manufacturers to take out licenses, and hence, the Manville Co. and the Thermoid Co. were out in competition with the world, and therefore he wanted the resolution rescinding the royalties—that the two companies couldn't afford to pay the ten per cent. royalty. It is clear to my mind, therefore, that the 'rescinding resolution' was passed not in furtherance of any prior agreement, but solely at the instigation and desire of the Manville and Thermoid companies, as an attempt to relieve themselves from the situation which then existed.

"The second defence is that of rescission. It is quite evident that no rescission ever took place. It appears that notices were sent out for a directors' meeting of the Asbestos

Brake Company, to be held at its New York office on November 14th, 1911, and that at that time and place there were present Mr. Manville, Mr. W. J. B. Stokes and Mr. Bonner. Of these three, Manville was the only one who was a director—the other three directors being (as it will be remembered) Mr. J. O. Stokes, Mr. Massie and Mr. Hubert. Hubert had not received the notice mailed to him; Massie was unable to come. Of course there was no quorum. Yet a pretended directors' meeting was held—Manville calling in his private secretary, Greenwood, to act as secretary of the meeting, since Bonner, who had come there on other business entirely, and was not a director, declined to act, although he did stay at the 'meeting.' Manville and Stokes presented and voted for the following 'resolution':

" '*Resolved*, In view of the conditions in connection with prices on brake band lining and the fact that it has been impossible to maintain prices as proposed at the time of the organization, that the provision for the members of this company paying in ten per cent. on the sale of brake band lining be rescinded, and until conditions warrant, no royalties are to be paid.'

"Manville immediately wrote to Massie as follows:

" 'I have your telegram advising us that you could not attend the meeting. There was a quorum present and we passed a few resolutions which we will hold and have you enter in the minute book at the first opportunity.'

"After the adjournment of the next—and last—directors' meeting, on January 17th, 1912, Manville handed the transcript of minutes to Massie. All four directors were present, but neither Hubert nor Massie knew anything about the so-called resolution.

"It is quite clear that, in the first place, there was no action by the Asbestos Brake Company at all. The resolution was not passed by the directors of the Asbestos Brake Company nor presented at a meeting of that company, and there was no ratification, either active or passive, at any meeting of the company. In the second place, the resolution

is not one of rescission. Rescission would mean the entire undoing of what had been done. It would mean, amongst other things, the assignment of the several patents back to their several prior owners. (Of course, in the nature of things, complete rescission could never be had—the parties could not be placed back in the *statu quo ante.*) But nothing of this kind was included or suggested. The 'resolution' simply purports to nullify, temporarily, at least, the provisions of the license agreements requiring the Thermoid Co. and Manville Co. to pay royalty. It was a release entirely without consideration.

"The incident and the conduct of the several parties in regard to it are most peculiar, but as I have said, it is evident that there was no rescission. The defendants also set up acquiescence, laches and equitable estoppel.

"As to acquiescence, I have pointed out that there was no corporate act done or taken in which the complaining stockholders can be said to have acquiesced. Inapplicable, therefore, are the numerous cases cited by defendants involving the well-recognized principle that where a corporation does an act which is *ultra vires,* and which would be set aside at the instance of dissenting stockholders if timely steps in behalf be taken by them, the act is deemed to be ratified and acquiesced in by them where they with knowledge remain silent and inactive for an unreasonably long period. There was not even any action by the Manville and Thermoid companies amounting to a notice of repudiation of the contract or of an intention not to abide by its terms. The thing that was done was an attempt to make a colorable record of action by the Asbestos Brake Company, and an attempt so smirched with *mala fides* as to render it impossible for a court of equity to regard it as a foundation upon which any edifice of rights in favor of defendants could be rested. I have in mind Manville's letter to Massie wherein he falsely stated that there had been a quorum present at the directors' meeting, and that several resolutions had been passed—statements which he knew to be false, and the fact that the subject-

matter of the 'resolution' was not brought before the next meeting of directors when there was not only a quorum, but a full attendance of all the directors, representing all the stockholding interests.

"Neither do I find laches. True it is that the action which has now been taken by this suit could have been taken equally well at any time during a period of about eight years prior to the filing of the bill. But laches involves something more than mere delay, mere lapse of time. There must be delay for a length of time which, unexplained and unexcused, is unreasonable under the circumstances, and which has been prejudicial to the defendant. *Cf. Johnston* v. *McKenna, 76 N. J. Eq. 217* (at *p. 229*); *affirmed, 77 N. J. Eq. 555;* where there was delay of some seven or eight years. *Cf.* also *Soper* v. *Cisco, 85 N. J. Eq. 165* (at *p. 174*).

"In the present case no prejudice is shown, or can be inferred, to have resulted to complainants. There has been no loss of memory, no loss of witnesses, no loss of evidence. Defendants' course of conduct was not induced by complainants' delay or inaction. Defendants have simply continued to act as they acted in the beginning. It will be borne in mind that complainants are in this court, suing on a legal right, their right to an accounting on an express covenant in a sealed contract. Equity has concurrent jurisdiction in the enforcement of such right, and in the present case was the necessary or appropriate forum since complainants must needs sue in the corporate right. In such a case, where complainants' bill is for the enforcement of a legal right, the equitable remedy is not ordinarily barred by mere acquiescence for a period less than the statute of limitations at law in a similar case, as is pointed out by Vice-Chancellor Emery in *Paterson* v. *East Jersey Water Company, 74 N. J. Eq. 49* (at *p. 97*); *affirmed, 77 N. J. Eq. 588*. The right of action being based on the covenant in the sealed contract would not be barred at law by the six-year limitation respecting the ordinary action of account, and hence will not be barred in equity as laches by analogy. *Lilliendahl* v. *Slegmaier, 45 N. J. Eq. 648* (at *p. 650*).

"I have already indicated that there are no special circumstances to raise equities in favor of defendants and turn delay into laches, and, of course, the defence of equitable estoppel, in so far as it is raised separately from laches, falls in the same way. Defendants' conduct was not induced, nor were they misled, by any acts or conduct of complainants. Defendants continued to manufacture and sell these brake linings at all times just as they had always done—both before and after the execution of the license agreements. They never at any time paid any royalties or made any returns. Their course was taken with their eyes open and at their own risk, and, as a matter of fact, in the face of the notice or warning given by Massie in his letters of October 5th, 1911 (*Exhibits C-7* and *8*). Complainants' delay has been unusual, it is true, for parties in such circumstances, but its only resulting prejudice is to complainants rather than defendants. Not even is there evidence to prove nor to indicate that defendants would not have continued to manufacture and sell if this litigation had been commenced eight years ago. Wherein does their position differ from an obligor on a bond matured due who has failed to pay principal or interest for eight years without complaint or protest from the mortgagee? Would he be heard to come in to equity and say that the mortgagee's silence and inaction had caused him to spend the money on the education of his children, for instance, and that the mortgagee must be held barred by an equitable estoppel?

"Defendants, in the course of their argument, refer to the concurrent obligation on the Asbestos Brake Company, under the terms of the license agreement, to prosecute outside infringers, and to the fact that this obligation was not performed by the Asbestos Brake Company. I do not see that this can be of any avail to defendants. No effort whatever was made by defendants to have the Asbestos Brake Company undertake or prosecute such suits, at least after January, 1912, at which time defendants were and had been for six months guilty of default and breach of their own obligation. They were the first offenders; their default and breach de-

prived the Asbestos Brake Company of funds to carry on such litigation, and they could at any and all times have taken the requisite steps to have such suits brought. That the suits were not brought was, to say the least, as much the fault of defendants as of complainants, and cannot raise either a legal bar nor an equitable estoppel against complainants, who were, as appears from the evidence (and this defendants in nowise seek to controvert), at all times ready and willing to have infringement suits brought against the other manufacturers.

"There remains to be considered the last defence interposed, namely, that the whole arrangement among the parties embodied in the pre-corporate agreement was unlawful as an agreement in restraint of trade; that the license agreements here sued upon are a part, and in furtherance of that unlawfull agreement, and hence, are invalid and unforceable.

"It is not claimed that the two license agreements sued on are in and of themselves alone unlawful. They are license agreements perfectly natural and proper to be made by an owner of patents, containing no unusual provisions. Each agreement cites the patents and patent applications owned by the Asbestos Brake Company, and grants a non-exclusive license to manufacture, sell and use asbestos brake linings embodying the inventions in the said patents and patent applications, as well as in such patents as might later be acquired by the licensor. There are provisions limiting assignment of the license to those only who should succeed substantially to the licensee's business and good-will; providing that sales of the articles embodying the inventions shall be at prices fixed by the licensor; requiring the licensee to render statements and pay royalties to the licensor; providing for damages or cancellation in case of breach, and for affixing the proper patent marks upon the articles sold. The licensor agrees to protect against infringers. All of these things are lawful and proper as between the owner of patents (at least where that owner is a natural person) and licensees. The contention of defendants is that the whole scheme and agreement among the four parties who incorporated the Asbestos Brake Company was unlawful under section 1 of the

act of congress of July 2d, 1890, known as the Sherman law (*U. S. Comp. Stat.* § 8820), which provides : 'Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal.'

"The object of patents and the patent laws is of course to secure to the patentee a monopoly for the term of the patent. In the exercise of that monopoly, competition as to the patented article vanishes except to the extent that the patentee permits, and the result, in a sense at least, is a restraint of trade. It is not against this, however, either in terms or intent, that the Sherman law is directed—it is *combination,* and combination *in restraint of trade,* which is forbidden.

"As is pointed out by the United States supreme court in *Standard Sanitary Manufacturing Co.* v. *U. S., 226 U. S. 20* the statute is a limitation upon the rights of all persons, patentees as well as others. And so a contract whereby the manufacturers of two *independent* patented inventions *agree not to compete* in the same commercial field creates a restraint of trade which results not from the patents but from agreement. *Blount Co.* v. *Yale & Towne Co., 166 Fed. Rep. 555* (at *p. 557*). It naturally results that where such agreement of such manufacturers of independent patented inventions take the form of incorporating their several interests into a company, and assigning their patents to that company so that there shall be a single owner of all the patents, the resulting situation is not thereby saved from being unlawful. It is the substance, not the form, which is to be looked into, and the agreement being unlawful, the form, which is the creature of the unlawful agreement, affords no shield.

"It is precisely that situation which defendants contend is disclosed in the case at bar. They contend that the object of the pre-corporate agreement and the purpose of the parties thereto, was to eliminate or restrain competition in articles covered by independent inventions, by fixing prices at which the same should be sold, and that the creation of the Asbestos Brake Company and the assignment of the several patents to it, and the execution of license agreements between it and

manufacturers of brake lining, all constituted, simply, means
to that end.   .

"It is true that the license agreements provide for the fixing
of prices at which the manufactured articles are to be sold
by the licensees. This a *bona fide* patent owner may lawfully
do. *Bement* v. *National Harrow Co., 186 U. S. 70.* It
would seem clear that he may also lawfully make as many of
such agreements with separate licensees as he may desire or
find profitable. *Rubber Tire Wheel Co.* v. *Milwaukee Rub-
ber Co., 154 Fed. Rep. 358; Indiana Manufacturing Co.* v.
*J. L. Case, &c., Co., 154 Fed. Rep. 365; Goshen Rubber Co.*
v. *Single Tube Co., 166 Fed. Rep. 431.* This is indeed con-
ceded by defendants, but they say that that is not the case
shown by the facts now before this court. They say that here
there is price-fixing, not by the owner and licensor of the
patents, but by agreement amongst the licensees.

"Of course it is perfectly clear and undisputed that tho
Asbestos Brake Company is simply the Manville Co., the
Thermoid Co., the Brake Liners Company, and Hubert in
another—a corporate—form, so that in essence the price-
fixing by the Asbestos Brake Company is price-fixing by the
four companies. It is also true that these four companies,
by their pre-corporate contract, agreed *together in advance* as
to the fixing and maintaining of the prices at which the
manufactured articles should be sold. In a sense, therefore,
it may be said to be true that there is here a price-fixing
agreement between licensees, because the Manville Co. and the
Thermoid Co. are licensees from the Asbestos Brake Com-
pany. But it is perfectly obvious that the price-fixing agree-
ment was made by them, primarily, at least, not as licensees
but as owners. Suppose there were four persons who had
collaborated in an invention and had had a patent therefor
issued to themselves; two desired to manufacture and the
other two did not. If they saw fit so to do, is there any
reason why they should not form a quadri-partite corpora-
tion, and assign their patent to it, under an agreement that
the two who desired to manufacture should receive licenses
so to do and should pay royalties to the corporation, that

licenses might be issued by the corporation to other manu-
facturers, and that the prices at which the manufactured
articles should be sold by the licensees should be fixed by the
corporation, namely, the four joint owners themselves. I
cannot conceive that such an agreement would be unlawful;
certainly I know of no adjudication so holding or indicating.

"However, defendants deny that the parties to the pre-
corporate agreement occupy any such position as the joint
owners in the suppositious case. They contend that the
four parties were owners of patents or patent applications
which were independent and not conflicting; that the agree-
ment was not for the proper purposes of *bona fide* owners of a
patent but had as its object the elimination of competition.
I am unable to find from the evidence that such is the fact.
It is true perhaps that some of the inventions were inde-
pendent, that as to some of them the respective owners might
have each manufactured something under his patent which
would not have infringed the others. But it is clear that if
this could have been done there would have been little, if any,
competition as among these articles. It is clear that the
thing which would benefit the public was an article manu-
factured under a combination of these patents and which
could not be manufactured under any one of them alone—
the brake lining made of the woven wire and asbestos tape,
which is so universally used to-day. It is also clear that there
had been interferences declared in the patent office among the
five patent applications of the parties to the original tri-
partite pre-corporate agreement; that the ultimate ownership
of the basic patent was a matter of uncertainty to be decided
only after litigation; that the value of the basic patent alone,
without the improvements of the other inventions, and *vice
versa* was much less than in combination, and this latter is
also true as to the improvement inventions in the patents of
the fourth party, the Brake Liners Company, who later joined
the first three. I am satisfied that the purpose and object of
the agreement and combination of the four parties was a
*bona fide* desire to settle the disputes, get half or quarter of
a loaf rather than no bread, and associate themselves as

joint owners of a combination of patents not independent but interdependent as a practical matter; that the provisions as to price-fixing were simply incidental provisions proper and lawful for them to make as the joint owners of such combination of patents and the agreement in that behalf not unlawful under the statute mentioned.

"I conclude, therefore, that complainants are entitled to relief—to a decree for accounting. The form of the decree may be settled on notice. During the course of these proceedings a receiver was appointed to take over the patents of the Asbestos Brake Company and bring suits against infringers. The payment of the amounts found due upon the accounting should be made to the receiver. I do not now recall whether or not the powers conferred upon him by the order appointing him are sufficiently broad to comprehend this, but if not they can be made so.

"It may be noted here that subsequent to the appointment of the receiver, notices were served by the Manville and Thermoid companies purporting to rescind the license agreements. To this action or attempt I accord no efficacy. There existed no more ground for rescission at that time than there did in November, 1911. I have not the notice now before me, but my recollection is that there was no accompanying tender or offer to restore the several patents to their original assignors. Certainly no such offer was at any time made prior to the appointment of the receiver.

"Subsequent to the formulation of the foregoing conclusions the parties have come before the court for settlement of the form of decree, and in the course of that application questions substantive as well as formal have arisen. Complainants, in the draft of decree presented by them, included certain provisions for the specific performance of the license agreements by the defendants in future. The bill prays for such specific performance as well as for the accounting, but the granting of this additional relief clearly is not a necessary consequence of the result reached in the prayer for accounting. The right to the accounting is, as I have heretofore indicated, a legal right enforceable, and here being en-

forced, in a court of equity. A decree ·for an accounting, although in some sense it amounts to· a partial enforcement of the contract, is not from a legal standpoint a decree for specific performance. *Sussex Railroad Co.* v. *Morris and Essex Railroad Co., 19 N. J. Eq. 13* (at *p. 28*). And the right to the latter is not a legal but an equitable right.

"Specific performance is extraordinary relief, and the award thereof rests in principle upon the inadequacy of other remedies to afford complainant that measure of relief to which he is equitably entitled under the circumstances. There may well be doubt whether in the case of a contract of this kind the future performance of the contract should be decreed or its violation enjoined, since the essence of the contract is for the payment of moneys, notwithstanding the undoubted fact that the trend of courts of equity in modern times is toward extending such relief. It seems to me that in the present case the practical result of a decree for future specific performance would at most be the elimination of the possible necessity for complainants to bring subsequent accounting suits if there should be future violation, substituting contempt proceedings in place of such suits. Such contempt proceed-ings might well partake largely of the nature of new suits, however, since a decree for specific performance must needs comprehend performance by complainants, or the Asbestos Brake Company, of the things provided by the agreements concurrently to be performed by the latter. Furthermore, the equitable principles governing this extraordinary relief of specific performance limit its award to those who seek it promptly. *Cf. Fry Spec. Perf.* (*6th ed.*) § *1102; Van Doren* v. *Robinson, 16 N. J. Eq. 256* (at *p. 263*). I take this still to be a requirement or limitation in specific performance cases, notwithstanding it is frequently lost sight of because the great majority of such cases are between vendor and vendee on contracts of sale, and in those cases the doctrine of trust or equitable title rather strongly motivates the court in somewhat the opposite direction. The complainants have certainly, in the present case, been quite the reverse of prompt in bringing suit, and if they thereby lose the right to· this ad-

ditional relief, which they might perhaps otherwise have had, it is their own fault.

"It seems to me that the exercise of that sound discretion to which the prayer for decree for specific performance is always addressed leads in the present case to the denial thereof, but such denial may be without prejudice to a like prayer in a future bill, should any such occasion of future violation arise.

"The question of interest upon the defaulted royalty payments was also raised. I think defendants are properly chargeable with such interest.

"I earlier said that I thought payment of the amounts found due upon the accounting should be made to the receiver. On further consideration of the internal situation of the Asbestos Brake Company, and the fact that defendants as stockholders will be entitled to receive back as dividends a large part of the royalties, less taxes and corporation expenses, it seems to me, and to counsel on both sides, that the decree as to payment may well await the result of the accounting."

*Messrs. McCarter & English* and *Mr. Francis C. Lowthorp,* for the complainants.

*Messrs Pitney, Hardin & Skinner* and *Mr. Edward L. Katzenbach,* for the defendants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Buchanan.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, BERGEN, KALISCH, BLACK, WHITE, HEPPENHEIMER, VAN BUSKIRK—8.

*For reversal*—PARKER, MINTURN—2.