A narrative of the factual events out of which this litigation has arisen should originate with the explanation that the defendant Michael Jelin was the owner of a tract of land divided into 169 lots situate in the City of Rahway. On October 11th, 1923, he conveyed these lots to Lakeside Manor, a corporation, probably organized for the purpose of acquiring title, and in which the complainant Ruben and the defendants Jelin, Szerlip, Hanauer and Mangin each held an equal number of shares of the capital stock. The entire consideration for the conveyance was the bond of the corporation conditioned for the payment of $84,500 payable five years thereafter with interest at six per centum and an accompanying mortgage encumbering the lands conveyed. Additionally, Ruben, Szerlip, Hanauer and Mangin executed a bond in which each obligated himself to pay to Jelin one-fifth (not in excess of $16,900) of any deficiency that might ensue after the foreclosure of the mortgage. A more definite and precise revelation of the character of this instrument will follow.
It is observed that the mortgage embodied the following covenants to be fulfilled by Jelin, the mortgagee or his assigns:
"The said mortgagee covenants on behalf of himself and his assigns that any time prior to maturity of this mortgage, he or his assigns will agree to release any of the aforesaid described lots upon the payment of $500 for each lot so released.
"It is understood and agreed that in the event that the mortgagor, or its assigns, shall at any time prior to maturity of this mortgage sell any portion of the above described lots then and upon the execution of such deed the said mortgagee, or his assigns agrees by these presents to execute a release of said mortgaged lots, giving a credit upon the principal due on this mortgage on the basis of $500, for each lot, and accept from the purchaser a first mortgage on said lots on the basis of $500 for each lot, to run for a period of three years and bearing interest at the rate of 6% per annum payable semi-annually; further that upon such lots as the said mortgagor, or its assigns, shall erect a building or buildings then and upon a sale of such buildings the said mortgagee or his assigns, agrees to release said lots upon the execution of a deed of conveyance thereof to such purchaser, giving a credit upon the principal due on this mortgage on the basis of $500 for each lot and accept from the purchaser a second mortgage against such lots and buildings so sold as aforesaid for the amount of $500 *Page 301 
for each lot running three years from the date of the execution of said mortgage, interest at 6% per annum, payable semi-annually."
From this it appears that Jelin engaged to release any lot from the lien of the mortgage upon the payment of $500, or if a lot were sold by the company, to release it upon receiving a first mortgage of $500 from the purchaser, crediting the sum of $500 on the mortgage debt in either event. If the lot had a building erected upon it by the mortgagor, he promised to release it from the mortgage encumbrance and accept from the purchaser a second mortgage of $500 covering the lot, payable three years after its date. It is also perceived that no limit is specified concerning the amount of the prior encumbrance to which the so-called second mortgage is to be subordinate.
It is revealed that during the next succeeding years, numerous lots were conveyed and releases were executed and credits granted by Jelin on account of the mortgage debt in correlative acknowledgment of payments or new mortgages evidently accepted in pursuance of the covenants of the mortgage. It is acknowledged that these credits amount in the aggregate to $30,069.16.
Certain transactions deserve specific mention. On March 25th, 1927, the corporation conveyed twenty-two lots to one Minichella. Concurrently Jelin executed and delivered to the corporation a release of these lots from the lien of his original mortgage of $84,500 and he received from Minichella a mortgage embracing these lots in the sum of $22,000. Incidentally, Minichella thereafter conveyed the lots to one Santoro, subject to the Jelin mortgage and in this deal Santoro delivered to Minichella a mortgage of $11,000. Certain significant provisions were incorporated in the mortgage from Minichella to Jelin which obligated the latter, under stated conditions, to release any of the lots from the lien upon receipt of $800 per lot, in cash or, to release them at the option of Minichella or his assigns, in return for a bond and second mortgage for that amount payable in three years at six per centum, which second mortgage should be subordinate only to a prior mortgage made to a building and loan association, *Page 302 
a bank or other company subject to the supervision of the Banking and Insurance Department and not exceeding 65% of an appraised value of the lot and the improvements thereon. Jelin was also obliged to subordinate his lien as mortgagee to a so-called construction loan mortgage in the amount of 60% of the entire cost of construction of each building on a lot of 33 1/2 feet frontage.
It is apparent that in this transaction Jelin had not received $500 or any other sum, per lot, in cash or a first mortgage free from covenants relating to subordination, and of like amount from Minichella for each lot, in consideration of his release of these twenty-two lots from the lien of his $84,500 mortgage. Although he had received from the purchaser a bond and first mortgage on the lots in an amount equivalent to $1,000 per lot, this mortgage contained the unconformable provisions to which previous reference has been made. Jelin, therefore, did not allow any credit to the corporation (or to the four indemnitors or guarantors) on account of the original mortgage debt. The divergent circumstances of this transaction were not expressly comprehended by the terms and provisions of the corporation's mortgage. The equitable obligation of Jelin to the corporation in the circumstances then existing need not be discussed or determined. For present purposes it suffices to recognize the facts that no credit on the bond of the corporation was given and that it was then uncertain what credit, if any, he ought to allow.
It may be inferred, although the evidence in this particular is meager, that the corporation, Lakeside Manor, was endeavoring to develop and market its real estate without sufficient cash capital available for the purpose. Additional sales were negotiated but not upon terms which would permit consummation under the requirements of the blanket mortgage. Some modification or change in the provisions relative to the release of lots from the encumbrance seemed imperative. The preparation and execution of the agreement dated June 4th, 1927, became the expedient.
Concisely stated, the agreement recites the existence of the original bond and mortgage, the sales of lots, the inability of *Page 303 
the corporation to meet the requirements for the release of the lots, and the fact that Jelin had already without consideration released the lots conveyed to Minichella and provides that Jelin will release lots from the mortgage in exchange for the receipt and acceptance by him of bonds and mortgages thereon delivered by the purchasers and that in such events Jelin is not required to give any credit therefor on the original bond and mortgage unless and to the extent only that Jelin shall receive actual payment on account of the new obligations. On and subsequent to the execution of this agreement Jelin released certain lots from the lien of the original mortgage and received from the purchasers their bonds and mortgages, apparently in pursuance of the terms of this agreement of June 4th, 1927, and he likewise subsequently subordinated his liens to the lien of mortgages given to secure the payment of either construction or permanent loans.
The venture was not progressing auspiciously. Suits to foreclose some of the first mortgages were prosecuted with the result that Jelin received little, if anything, on account of the indebtedness secured by the second mortgages. In 1929, the corporation, Lakeside Manor, at the suit of Ruben was adjudged to be insolvent and a receiver was appointed who liquidated the remaining assets of the company.
In view of these occurrences Jelin evidently assumed the position that he had not received payment of the original mortgage accompanied by the indemnity or guaranty agreement delivered to him by the corporation and the individual indemnitors, and having assigned his interest in the subject-matter of these instruments to his son Max, the latter instituted an action at law against Ruben to establish an alleged liability of Ruben under the terms of the agreement of June 4th, 1927.
Thus the events may be tersely recounted amid which the complainant Ruben filed the (original) bill in the present cause. Michael Jelin, Max Jelin, Adolph Hanauer and the administrator of the estate of David H. Szerlip are the defendants. Subsequently, the receiver of the company was reinstated and now unites with the complainant in seeking discovery and an accounting by Michael Jelin and he additionally *Page 304 
prays payment to him of the sum, if any, paid to or received by Jelin in excess of that which was actually due to the latter as mortgagee for principal and interest on the original mortgage debt.
The complainant Ruben alleges that he did not execute such an agreement as that of June 4th, 1927, and if his purported signature appears on such an agreement it is a forgery, or if he did execute an agreement of that nature, his execution of it was obtained by fraud and misrepresentation. He therefore declares that the reciprocal and contractual obligations between Jelin, the corporation and himself as expressed in the original mortgage and indemnity agreement were never modified or altered and that in relation to his own liability he is entitled to additional credits for which Jelin has never accounted.
The defendants, Hanauer and the administrator of the Szerlip estate have refrained from interposing any defense and a decreepro confesso has been obtained against them. The Jelins have filed an answer in which they deny most of the allegations of the bill but admit, inter alia, the allegations relating to the execution and delivery of the original bond, mortgage and indemnity agreement, and they aver that the agreement of June 4th, 1927, was voluntarily entered into by the complainant and the other parties. These defendants by way of counter-claim seek a decree against the complainant Ruben for such amount as may be determined to be owing by him to Jelin under and by virtue of the so-called indemnity engagement accompanying the original mortgage and the agreement of June 4th, 1927.
In resisting the counter-claim, the complainant Ruben not only reaffirms the factual allegations embodied in the bill pertaining to the 1927 agreement, but avers that the agreement was without any valid consideration; and that in subordinating his acquired liens to other liens and thereafter neglecting to inform Ruben of the subsequent proceedings endangering and extinguishing such securities, Jelin has discharged the complainant Ruben from all liability for any deficiency on the original mortgage debt.
The controversial issues ultimately formulated by the pleadings *Page 305 
for determination are: (1) The complainant Ruben having acknowledged at the final hearing that he signed the agreement of June 4th, 1927, was it based upon a good and valid consideration? (2) Was Ruben induced to sign this latter agreement by fraud and misrepresentation? (3) Was Jelin under a duty to inform Ruben of proceedings likely to jeopardize the primary security for the payment of the original mortgage debt? If so and if he ignored this duty, is Ruben discharged from his agreements to indemnify Jelin against the loss therein mentioned or did Ruben waive the observance and fulfillment of such duty? (4) Has Jelin elected to accept the mortgages taken pursuant to the agreement of June 5th, 1927, in satisfaction of the original mortgage debt? (5) Is the Jelin counter-claim barred by laches? (6) Should there be an accounting? These issues will be considered in the order in which they have been summarily individualized.
First, it is apparent that the consideration supporting the agreement of 1927 resides in the covenant of Jelin to release lots upon the receipt of mortgages securing the payment of amounts in excess of the amount specified in the former agreement and in subordinating in some exigencies such new mortgages to prior encumbrances not recognized or contemplated by the previous agreement.
Second, an examination of the evidence adduced leads to the conclusion that the nebular testimony of Ruben arrayed against that of Hanauer and the evident circumstances falls short of proving that Ruben was induced to sign the agreement of 1927 by fraud or misrepresentation. In the absence of fraud, it must be presumed that in signing the agreement, Ruben was aware of the contents of the instrument, although he may not have truly evaluated the consequences of its terms. Williams v. Leisen,72 N.J. Law 410; 60 Atl. Rep. 1096; Alexander v. Ferguson,73 N.J. Law 479; 63 Atl. Rep. 998; Hegedus v. Thomas Iron Co.,94 N.J. Law 292; 110 Atl. Rep. 822; Christie v. Lalor,116 N.J. Law 23; 181 Atl. Rep. 312.
In the briefs, the two agreements executed by the complainant Ruben and others have been denoted for the mere *Page 306 
purpose of identification either as guaranty or indemnity agreements. There is, of course, an essential difference, in legal significance and effect, between a guaranty and a covenant of indemnity against liability or against damage and loss. SeeWestville Land Co. v. Handle, 112 N.J. Law 447;171 Atl. Rep. 520; North v. Jos. W. North Son, Inc., 93 N.J. Law 438;108 Atl. Rep. 244. The mutual intention of the parties must be ascertained. The agreement of June 4th, 1927, contains this paragraph:
"The intent and purpose of this agreement is to indemnify and save harmless the said Michael Jelin from any loss arising out of the acceptance of said mortgages and the release of the same and the acceptance of second mortgages * * *."
The obligation undertaken by Ruben and others on October 11th, 1923, was certainly not an absolute and unconditional guarantee of the payment by the corporation of the mortgage debt. This instrument recites that it is the intent that each obligor shall "guarantee or otherwise indemnify the said Michael Jelin, on any loss arising out of any deficiency on the foreclosure of the mortgage * * *." The condition of the obligation is that each obligor "shall well and truly pay or cause to be paid to the said Michael Jelin, one-fifth of any deficiency judgment that may arise out of the foreclosure and sale of a certain bond and mortgage this day made by the Lakeside Manor, a body corporate, to the said Michael Jelin, to secure the payment of $84,500. * * *"
The contractual indemnification against loss in the circumstances of this case resembles a guarantee of collection.McMurray v. Noyes, 72 N.Y. 523; 28 Am. R. 180. Where one obligates oneself to indemnify another against loss arising out of a transaction of the present nature between the indemnitee and a third party, liability on the part of the indemnitor is not incurred until after the indemnitee in the exercise of reasonable diligence nevertheless has been unable to collect the debt from the mortgage security as contemplated by the indemnification agreement. The original mortgage and the mortgages subsequently taken by Jelin constituted the primary security for the payment to Jelin of the debt of $84,500. *Page 307 
It may be intimated that the liability of Ruben has not yet arisen because there is no proof of "any deficiency judgment." Equitably, it should be recalled that those including Ruben who signed the first indemnity agreement were, together with Jelin, the owners in equal shares of all the capital stock of the corporate mortgagor. Each sought to accomplish a personal benefit in underwriting one-fifth of the possible loss. It is now impossible to resort to the mortgage security. It has been in fact exhausted. There have been foreclosures of mortgages covering lots formerly embraced by the original mortgage. Some such proceedings have been prosecuted by Jelin in respect of mortgages taken by him (in accordance with the terms of the original mortgage or in accordance with the terms of the subsequent agreement of June 4th, 1927), all in substitution for the release of the lien of the original mortgage. Other suits have been prosecuted by the holders of mortgages to which Jelin had subordinated his mortgages in pursuance of the terms of the agreements. Moreover, lots were sold for unpaid taxes and the remaining lots owned by the corporation were sold by the receiver, thereby accomplishing an absolute exhaustion of the mortgage security. In equity, the fact that the original mortgage has not been foreclosed and a deficiency judgment obtained against the corporation does not in such circumstances barricade the effort of Jelin to recover his loss from the indemnitors.
The evidence, however, seems to disclose that Ruben was in nowise informed of the default in the payment of the mortgages so taken by Jelin or of the foreclosure of those mortgages which would likely amputate the lien of the second mortgages held by Jelin. Recognizing the character of the obligations which Ruben had contractually assumed, there was in the circumstances undoubtedly a duty resting upon Jelin to inform him and the other guarantors with reasonable promptness of such defaults and of the institution of such proceedings, to enable them to safeguard and protect their interests. 28 C.J. 896 § 12; Ibid. 981 § 138;Ibid. 985 § 142; Boorstein v. Miller, 124 N.J. Eq. 526;3 Atl. Rep. 2d 87. The failure of Jelin to give this requisite notice is *Page 308 
evident but there is no proof whatever that Ruben has suffered any loss by reason of such neglect. The mere failure to notify Ruben of those events does not of itself discharge Ruben from all liability. Loss proximately resulting from such failure of duty may justify a discharge pro tanto but proof of any such loss is inexistent. See Restatement of the Law of Security pp. 352, 355,§ 132 (2); p. 369, § 137; Stearns on the Law of Suretyship142 § 99; Spencer on Suretyship 145 § 108.
It is next contended that the indemnity agreement of 1927 afforded Jelin an election of remedies and that he elected to accept the mortgages delivered to him by the purchasers in extinguishment of the original corporate debt. Any one of three situations might result from the acceptance of the mortgages in the increased amounts by Jelin in return for his releases of lots from the lien of the original mortgage. First, there might be a partial or total failure to pay the principal and interest on any of these mortgages. In that event the 1927 agreement obligated the three indemnitors to save Jelin harmless to the extent therein stated. Second, Jelin might receive sufficient payments by the mortgagors which, together with the credits already allowed, would fully satisfy the original indebtedness. In that case Jelin would not sustain any loss, and there would be no occasion to resort to the 1927 agreement. Third, payments plus acceptable mortgages might be found to exceed the original indebtedness. In that more fortunate eventuality, the agreement directed that Jelin should be privileged to select the mortgages he desired to retain as credits, and the remaining mortgages should be assigned to the corporation. There has been no settlement and nothing which Jelin is shown to have done indicates a waiver of the guaranty. His acts appear to have been exerted in an attempt to collect the debt. The contention that Jelin elected to accept the mortgages and abandon his right to indemnification is not supported by the evidence.
Then it is proposed by Ruben that Michael Jelin has been guilty of laches which should prohibit him or his assignee from a recovery in this court based upon the indemnity agreements. It will be noticed that the delay solely emphasized is *Page 309 
the tardiness in instituting an action against Ruben and the others on the indemnity agreements and not in deferring a foreclosure of the original mortgage. The initial indemnity agreement is in the form of a bond executed under seal. The action to enforce the obligation of this bond was instituted by Jelin eleven years after its date. The prosecution of this action was enjoined by an order made in this cause at the instance of the complainants. By counter-claim the legal right of Jelin or his assignee is reasserted here. In such cases, equity follows the law and the doctrine of laches will not be applied to bar the suit within a shorter period than that allowed at law. Massie
v. Asbestos Brake Co., 95 N.J. Eq. 298 (at p. 311);123 Atl. Rep. 155; reversed on other grounds, 96 N.J. Eq. 612;126 Atl. Rep. 669.
Finally, it must be recognized that an accounting is a proper measure to disclose the liabilities, if any, of the parties. In view of the conclusions hereinbefore expressed, an accounting before a master of this court will be ordered.
Of course, in the existing posture of the evidence, the prayers relating to the transfer of excess mortgages or their equivalent in cash to the receiver, the surrender of the original mortgage for cancellation or the determination of the amount due Max Jelin must, of necessity, abide an accounting. *Page 310